UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

PEDRO HERNANDEZ,

                 Petitioner,

      -v-

DONITA MCINTOSH,

                 Respondent.

22 CV 2266 (CM)

X

-------------------------------------------------------------------

## DECISION AND ORDER (1) DENYING OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, (2) ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AS THE DECISION OF THE COURT, AND (3) DENYING PETITION FOR A WRIT OF HABEAS CORPUS

McMahon, J.:

On February 14, 2017, a jury sitting in New York State Supreme Court (New York County), found Petitioner Pedro Hernandez guilty of kidnapping and murdering a six-year-old boy, Etan Patz, back in 1979. Hernandez is currently in state prison serving a 25-years to life sentence for his crimes.

The notorious Etan Patz case captivated New York City and, indeed, the nation at the time of the boy's disappearance in in 1979. Etan disappeared while walking the two blocks from his family's apartment to his school bus stop. An investigation ensued, but, at the time, no suspects were arrested or charged. Etan was never found. Hernandez was convicted primarily based on his multiple confessions to the crime. A central issue before and at trial was whether the confessions given by Hernandez – who has a history of mental illness and a low intelligence quotient – were made voluntarily, knowingly, and intelligently or were instead inadmissible, having been obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

In a petition filed pursuant to 28 U.S.C. § 2254(a), Hernandez challenges his conviction for four principal reasons:

First, Hernandez argues that the trial court erred in denying his motion to suppress his confessions by unreasonably finding both that he was not in custody when he initially confessed and that he understood and could properly waive his *Miranda* rights.

Second, Hernandez contends that the state courts erred by ignoring *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004), which found unconstitutional the law enforcement two-step interrogation practice of intentionally obtaining a confession without giving *Miranda* warnings, then issuing the warnings, and then obtaining a second confession.

Third, Hernandez asserts that the trial court made evidentiary rulings that deprived him of the opportunity to present a complete defense. Hernandez says that those rulings denied him the opportunity to present evidence of the culpability of one of two-third parties, as well as police reports memorializing contemporaneous statements made in the initial 1979 investigation.

Fourth and finally, Hernandez argues that the state courts improperly ignored prejudicial contacts between court officers and jurors, including informing jurors that jurors from Hernandez's first trial were sitting with Patz's family at the second trial.

On April 7, 2022, the Court referred Hernandez's petition to Magistrate Judge Robert W. Lehrburger for the preparation of a Report and Recommendation, pursuant to 28 U.S.C. § 636(b); upon receiving his referral, Judge Lehrburger immediately ordered the Respondent to answer the petition.

On September 2, 2022, the District Attorney for New York County filed responsive papers; and on December 2, 2022, Hernandez filed his reply

On August 23, 2023, Magistrate Judge Lehrburger heard oral argument on Hernandez's motion.

On October 10, 2023, Magistrate Judge Lehrburger issued his Report and Recommendation.

In one of the most thorough and comprehensive reports this Court has ever received in response to a state habeas referral, Judge Lehrburger ultimately concluded (after 130 pages of discussion and analysis) that - while the circumstances of Hernandez's confessions implicate federal constitutional concerns - the highly deferential standard Congress has afforded to state courts in habeas cases meant that Hernandez's petition should be dismissed. Hernandez filed timely objections.

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections are made, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). To accept those portions of the report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *King v. Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (citation omitted); *see also Wilds v. United Parcel Serv.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y 2003).

1. *Objections relating to the voluntariness of Petitioner's confessions*

Petitioner contends that Judge Lehrburger made two errors in connection with his review of the state court's decision not to suppress Hernandez' confessions.

First, he argues that Judge Lehrburger was wrong to reject his argument that certain of the state court's findings about the voluntariness of the confession – specifically, its findings that: (1) Hernandez was not restrained at the CCPO; (2) he was repeatedly told that he was free to leave and voluntarily opted to continue to speak with detectives; and (3) that the interrogation was never hostile or accusatory – were unreasonable in light of the evidence  presented at the suppression hearing. (Petitioner's Objections to the R&R, ECF No. 42: 11).

In support of this argument, petitioner essentially repeats the arguments from his opening and reply memoranda of law (*see* PO: 13-23; Petitioner's Memorandum of Law, ECF No. 1-2: 37-48; Petitioner's Reply Memorandum of Law, ECF No. 25: 3-8). But as petitioner is constrained to acknowledge (PO: 12 n.4), under 28 U.S.C. § 2254(d)(2) and 28 U.S.C. § 2254(e)(1), "a federal court will 'presume the correctness of state courts' factual findings unless [petitioners] rebut this presumption with 'clear and convincing evidence.'" *Wilson v. Capra*, 2023 WL 7179268, at \*2 (2d Cir. Nov. 1, 2023) (alteration in original) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473-74 [2007]). Applying that standard, Judge Lehrburger correctly rejected petitioner's arguments. (*See* R&R at 34-60).

Petitioner also contends that, despite identifying the correct legal standards and addressing the relevant facts, Judge Lehrburger erroneously "focused on whether any *single* fact, in isolation, might conceivably support the state court's finding," rather than evaluating the totality of the circumstances (PO: 11-12; *see id.* at 14, 16). But, contrary to petitioner's contention, Judge Lehrburger concluded that the state court's custody determination was reasonable based on all the evidence presented to the state court *(see* R&R at 38-40).

Because I find that the Magistrate Judge's conclusion that Hernandez was not in custody when he gave his initial confession to the police (*see* R&R at 40) is not erroneous, I do not need

4

to address Respondent's objection to Judge Lehrburger's conclusion that Hernandez' *Seibert* claim with respect to his confessions was not procedurally defaulted. *See* R&R at 69. However, I note that this is not a sound objection, and I would overrule it if it were necessary for me to reach the issue, for the reasons set forth in the Report at pages 70-76. I would also conclude, as did the learned Magistrate Judge, that Hernandez failed to establish that his pre-and-post Miranda confessions were part of a single continuous chain of events for which there was no attenuation, and no intervening time or circumstances, *see Missouri v. Seibert*, 542 U.S. 600, 606-617 (2004), given the Appellate Division's finding that questioning of Petitioner by ADA Dursanti was "fully attenuated" – a finding that gets AEDPA deference. In this regard I also defer to Judge Lehrburger's discussion of the issue, which I adopt as my own.

### 2. *Objection with regard to Petitioner's Ability to Waive his Miranda Rights*

Petitioner objects to the Report on the ground that Judge Lehrburger "overlooked" the alleged "dilutive effect" that the pre-*Miranda* interrogation had on his ability to voluntarily waive his *Miranda* rights (PO: 24-26). But petitioner fails to explain how Judge Lehrburger could have overlooked an argument that was not raised in the written submissions before the state courts or this Court. As petitioner acknowledges (PO: 24), he raised this contention for the first time at oral argument before the Magistrate Judge. Thus, there was no reason for Judge Lehrburger to address it. *See, e.g., United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) ("Normally, we will not consider arguments raised for the first time in a reply brief, let alone [at or] after oral argument." [quoting *Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995)]). I, thus, overrule this objection.[1]

---

[1] Petitioner has consistently argued that his mental state, due to an alleged combination of mental illness, lack of intelligence, and impairment by medication, was such that he could not *knowingly* or *intelligently* waive his *Miranda* rights (*see* Pet. MOL: 48-51; Pet. Reply MOL: 8-10; Petitioner's Appellate Division Opening Brief [ECF No. 1-93]: 94-99; Petitioner's Appellate Division Reply Brief, ECF No. 1-95: 8- 12).

### 3. *Objection relating to various evidentiary rulings*

Petitioner objects to Judge Lehrburger's rejection of his argument that the state court's evidentiary rulings – (i) concerning third-party culpability evidence related to Othniel Miller and (ii) hearsay evidence from unavailable witnesses – were contrary to or based upon an unreasonable application of clearly established federal law. Specifically, petitioner alleges that Judge Lehrburger erred when he concluded (1) that the New York rule of evidence pursuant to which the third party culpability evidence was excluded did not contravene *Holmes v. South Carolina*, 547 U.S. 319 (2006); and (2) that the state court's application of the state evidentiary rule in this case did not violate petitioner's constitutional right to put forth a complete defense. (PO: 36-37). Petitioner also argues that Judge Lehrburger, like the state court, misapplied *Chambers v. Mississippi*, 410 U.S. 284 (1973), because the hearsay he offered at trial "bore persuasive assurances of trustworthiness" and was "critical" to his defense (PO: 37).

Because these are exactly the same arguments petitioner made in his opening and reply memorandum of law (Pet. MOL: 58-63; Pet. Reply MOL: 19-26), they are subject to clear error analysis. There was no clear error in the Magistrate Judge's reasoning. *See, e.g., Curet v. Graham*, No. 14-cv-4831 (VSB) (DF), 2022 WL 1486492, at *1 (S.D.N.Y. 2022).

Petitioner's *Holmes* argument is baseless. Judge Lehrburger is just the latest in a long list of jurists to conclude that New York's rule for determining the admissibility of third-party culpability evidence does not violate the rule articulated in *Holmes*, joining the state trial judge, four Justices of the Appellate Division, six Judges of the New York Court of Appeals, and several other federal judges based in this Circuit (*see* R&R at 102-03; Resp. MOL: 128-33). Judge Lehrburger relied on the applicable New York and federal precedent, including other habeas decisions, all of which recognize that New York's rule on the admissibility of third-party

6

culpability evidence is fully consistent with *Holmes*. This is because – unlike the South Carolina rule that was found unconstitutional in *Holmes* – the New York rule does not tie the admissibility of third-party culpability evidence to the strength of the prosecution's case. Instead, the admissibility of such evidence is subject to a general balancing test that governs the admissibility of all evidence— the judge must weigh the probative value of the evidence against the prospect of delay, undue prejudice to the opposing party, confusing the issues, or misleading the jury (*see* R&R at 97-103).

    Therefore, this aspect of petitioner's objection fails under any standard of review.

    4. *Objections relating to the lack of a jury contamination hearing*

    Petitioner objects to Judge Lehrburger's conclusion that the state court's summary denial of his jury contamination claim without holding a hearing was not contrary to or an unreasonable application of clearly established Supreme Court precedent. In petitioner's view, the Supreme Court's decisions in *Mattox v. United States*, 146 U.S. 140 (1892), *Remmer v. United States*, 347 U.S. 227 (1954), and *Parker v. Gladden*, 385 U.S. 363 (1966), require trial courts to hold hearings any time there are allegations of improper contacts with sitting jurors, so Judge Lehrburger erred in distinguishing those cases on their facts (PO: 39-42). Because petitioner has simply reiterated his original argument, this objection is subject to clear error review. *See Curet*, 2022 WL 1486492, at *1.

    Petitioner is wrong. Judge Lehrburger properly concluded (R&R at 123-29) that, even accepting the allegations in petitioner's post-verdict motion as true, they did not need to be explored at an evidentiary hearing, because they "failed to sufficiently articulate a ground for relief." (R&R at 124).

7

First and foremost, none of the Supreme Court's cases involving improper juror contacts expressly states, as petitioner seems to believe (PO: 39-41), that a hearing is required *any* time an allegation is made about improper contacts with a sitting jury. *See, e.g., Smith v. Philips*, 455 U.S. 209, 217 (1982) ("Such determinations *may* be made at a hearing like that ordered in Remmer and held in this case."); *Remme*r, 347 U.S. at 229 (noting that a hearing would be required in a criminal case involving "private communication[s], contact[s], or tampering with a juror ... *about a matter pending before the jury*" because such contacts are "presumptively prejudicial" [emphasis added]).

The Second Circuit has read the Supreme Court's precedent as not requiring a hearing in all cases where there is a suggestion of prejudicial occurrences. *See, e.g., Haxhia v. Lee*, 637 F. App'x 634, 637 (2d Cir. 2016) ("*Smith* does not *require* a court to hold a hearing to investigate prejudicial occurrences, and it does not specify what actions short of a hearing may be appropriate under a different set of circumstances."); *Taus v. Senkowski*, 134 F. App'x 468, 470 (2d Cir. 2005) ("A court need not inquire into juror-misconduct allegations unless the defendant provides 'reasonable grounds' for an inquiry; the defendant may not request a hearing to conduct a 'fishing expedition.'"); *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) ("The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality."); *see also Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003) ("*Remmer* and *Smith* do not stand for the proposition that *any time* evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias.").

Thus, as Judge Lehrburger correctly recognized, the facts presented in *Mattox* (jurors being informed about excluded evidence and external analysis), *Remmer* (attempted bribery of a juror), and *Parker* (jurors being told that the defendant was guilty) all involved improper jury contacts

8

"*about a matter pending before the jury,*" and therefore were presumptively prejudicial. (*See* R&R at 123-24). Here, the allegedly improper contact was alerting the jurors to the fact that some of the people who had served as jurors at Hernandez' first trial were sitting in the gallery– information that has nothing to do with the People's case against Hernandez.

Moreover, the jurors were already aware that there had been a prior trial. (*See* Exs. 22G at 3632:4-5 (Julie Patz referring to testimony provided "during the last trial"); 22H at 4030:8- 24 (Trial Judge instructing jury that they "may have heard a witness refer to a first trial" but "that first trial was not concluded, and, therefore, it has no bearing on the evidence in this case.") *See Curet v. Graham*, No. 14-CV-4831, 2019 WL 13184139, at \*35 (S.D.N.Y. Jan. 14, 2019), *R & R adopted* 2022 WL 1486492 (S.D.N.Y. May 11, 2022) (finding no prejudice in extra-record evidence that "was largely cumulative of other evidence in the record"). The Trial Judge instructed the jury that the "[first] trial or any reference to it, is not evidence of anything, and you are not to speculate or consider it." (Ex. 22H at 4030:13-18; *see also* Ex. 22U at 10138:20-23.) *See Smith v. Graham*, 2012 WL 2428913, at \*18 (affirming state court's dismissal of petitioner's juror misconduct claim where "jury was already aware that Petitioner was on parole … and … would thus have recognized that Petitioner had a prior criminal history" and jury had received specific instructions not to allow Petitioner's parole status to influence their verdict). Therefore, the alleged "prejudice" from the jurors' learning that their predecessors retained enough interest in this famous case to attend the second trial is nonexistent.

Because clearly established federal law does not require a hearing any time an allegation is made about improper contacts with a sitting jury, petitioner's objection is overruled.

Judge Lehrburger also found that, as Hernandez's jury contamination claim was based on speculation and hearsay, the trial court's summary rejection of the claim was not contrary to or

based upon an unreasonable application of clearly established federal law. (R&R at 125-29). Hernandez offered no affidavits from jurors, and none of the jurors spoken to by investigator O'Brien said that they learned about the first panel jurors from a court officer. *See* CPL § 330.40(2)(a) ("The moving papers must contain sworn allegations, whether by  the defendant or by another person or persons, of the occurrence or existence of all facts essential to support the motion. … Such sworn allegations may be based upon personal knowledge of the affiant or upon information and belief, provided that in the latter event the affiant must state the sources of such information and the grounds of such belief"). "A post-verdict hearing on allegations of juror impartiality is only required when 'the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.'" *Stone v. Griffin*, No. 17-CV-8741, 2020 WL 7390188, at *8 (S.D.N.Y. Aug. 29, 2020) (quoting *Ianniello*, 866 F.2d at 543). Since there was no evidence in the record that the allegedly prejudicial contact actually occurred, there was no need for a hearing.

### 5. *Objections Raised to the Trial Court's Response to the Jury Note*

With these objections out of the way, I turn to the issue that troubled both Judge Lehrburger and myself the most— the trial judge's response to a note in which the jury asked for guidance about what to do if it concluded that Hernandez' initial, un-Mirandized confession was involuntary. The learned Magistrate Judge concluded that the judge's terse one word response to the note, while technically "correct," denied Hernandez due process – especially given the importance of  Petitioner's confessions to the People's case – because it failed to explain to the jury what it would have to do if it found that the initial confession was not voluntary. However, Judge Lehrburger also concluded that, under the unforgiving standards applicable on habeas review, this error, while of constitutional dimension, was harmless, because the Appellate

10

Division: First Department – whose decisions are entitled to substantial habeas deference – found that any reasonable jury would have to conclude that Hernandez' final post-*Miranda* confession to law enforcement (his confession to ADA Durasanti) was sufficiently attenuated from the initial confession so that it could not be deemed part of a single continuous course of conduct. The Appellate Division so found because the confession to Durasanti came eleven hours after the non-Mirandized confession, an interval that include a period of time in which Hernandez both ate and slept. R&R at 93-95.

Both Hernandez and the People object to Judge Lehrburger's Report in this regard. Respondent objects to Judge Lehrburger's conclusion that the "the trial court's response to the jury [note] was so deficient as to deprive Hernandez of due process." (R&R at 83, 88). Petitioner objects to his conclusion that, given the Appellate Division's finding, the trial court's erroneous response to the jury note was harmless error under AEDPA and *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (PO: 26-36; *see* R&R at 88-95).

I am going to overrule both objections and adopt Judge Lehrburger's opinion as my own. However, I believe this issue is sufficiently close that it should be reviewed by the Second Circuit.

At the end of the case, the trial judge instructed the jury on the standards for determining voluntariness, custodial interrogation, and *Miranda* waiver. These instructions are set out in their entirety here in a footnote.[2] The jurors were given no instructions about how to treat Hernandez's

---

[2] I now want to discuss the law as it relates to testimony concerning statements of the defendant made to law enforcement, that is police officers and an Assistant District Attorney.

Our law does not require that a statement by a defendant be in any particular form. It may be oral or written or electronically recorded. And there is no requirement that a statement be made under oath.

Now, you heard testimony that the defendant here was questioned by the police and made certain statements, some of which were recorded on video. There is also testimony that the defendant made a videotaped statement to an Assistant District Attorney. Now, under our law, before you may consider any such statement as evidence in the case, you must first be convinced that the statement attributed to the defendant was, in fact, made by him. In

11

determining whether the defendant made the statement, you may apply the tests of believability and accuracy that I went over just a few minutes ago.

Also, under our law, even if you find that the defendant made a statement, you still may not consider it as evidence in the case unless the People have proved beyond a reasonable doubt that the defendant made the statement voluntarily. So how do you determine whether the People have proved beyond a reasonable doubt that the defendant made a statement voluntarily? First, under our law, a statement is not voluntary if it is obtained from the defendant by the use or threatened use of physical force. In addition, the statement is not voluntary if it is obtained by means of any other improper conduct or undue pressure which impairs the defendant's physical or mental condition to the extent of undermining his ability to make a choice of whether or not to make a statement. In considering whether a statement was obtained by means of any improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice of whether or not to make a statement, you may consider such factors as the defendant's age, intelligence, physical and mental condition, and the conduct of the police during their contact with the defendant including, for example, the number of officers who questioned the defendant, the manner in which the defendant was questioned, the defendant's treatment during the period of detention and questioning, and the length of time the defendant was questioned. It is for you to evaluate and weigh the various factors to determine whether in the end the statement was obtained by means of any improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice of whether or not to make a statement.

Finally, a statement of a defendant is not voluntarily made when it is obtained from the defendant by law enforcement by means of any promise or statement of fact which promise or statement creates a substantial risk that the defendant might falsely incriminate himself. A promise or statement of fact made to a defendant does not by itself render the defendant's statement involuntary. A defendant's statement would be involuntary only if the promise or statement made to him created a substantial risk that he might falsely incriminate himself.

All right. So if you have decided that the defendant's statements to law enforcement were made voluntarily, as I have just defined that term, you must then decide whether the defendant was in the custody of the police when he made statements to them. In other words, you must decide whether all or some of the statements were made in response to questioning while the defendant was in custody. This is because under our law before a person in custody may be questioned by the police or an Assistant DA, that person first must be advised of his rights. Second, he must understand those rights. And, third, he must voluntarily waive those rights and agree to speak tothe police or the Assistant District Attorney.

On the other hand, a defendant who is not in custody when questioned by the police or Assistant DA, need not be advised of his rights, and any voluntary statement may be considered by you, the jury.

Now, the term in custody has a special legal meaning. Under our law, a person is in custody when he is physically deprived of his freedom of action in any significant way. The fact that the defendant was being questioned by police or that the questioning took place inside a police station does not necessarily mean the defendant was in custody. Whether the defendant was in custody at the time of the questioning is not determined by what the defendant himself believed or by what the police believed. In other words, the test is not whether the defendant believed he was in custody or the police believed he was in custody. The test is what a reasonable person, innocent of any crime in the defendant's position, would have believed. If that reasonable person would have believed that he was in custody, then the defendant was in custody. If that reasonable person would have believed that he was not in custody, then the defendant was not in custody. To decide whether a reasonable person innocent of any crime in the defendant's position would have believed that he was in custody, you must examine all of the surroundings circumstances, including, but not limited to the reason the defendant was speaking to the police or being questioned by the police, where the questioning took place, and whether the defendant appeared at the police station voluntarily, how many police officers took part in the questioning, whether the questioning was investigative or accusatory, whether the questioning took place in a coercive atmosphere, whether the defendant was handcuffed or physically restrained, whether the police treated the defendant as if he were in custody, whether the defendant was offered food or drink, and whether the defendant had been allowed to leave after the questioning.

12

post-*Miranda* confessions if they concluded that his pre-*Miranda* confession was involuntary, as they were entitled to do. The trial judge had ruled, after a pre-trial *Huntley* hearing, that the post-*Miranda* confessions were voluntary and declined to suppress them. However, the fact that the court admitted the confessions into evidence did not mean that the jury was required to find that they were voluntarily given. *See Jackson v. Denno*, 378 U.S. 368, 401, (1964) (Mr. Justice BLACK, with whom Mr. Justice CLARK joins as to Part I of this opinion, dissenting in part and

Next, under our law, before a person who is in custody may be questioned by the police or an Assistant District Attorney, that person first must be advised of his rights. Second, must understand those rights and, third, must voluntarily waive those rights and agree to speak to the police or an Assistant District Attorney. If any one of those three conditions is not met, a statement made in response to questioning while the defendant is in custody is not voluntary and, therefore, you must not consider it.

Now, there is no particular point in time that the police or the assistant DA are required to advise a defendant in custody of his rights so long as they do so before questioning begins. A defendant in custody need be advised only once of the rights regardless of how many times or to whom the defendant speaks after having been so advised provided the defendant is in continuous custody from the time he was advised of his rights to the time he was questioned, and there was no reason to believe that the defendant had forgotten or no longer understood his rights. Our law does not require that the advisings of the rights or the defendant's waiver of those rights be in any particular form. They may be oral or written or electronically recorded.

While there is no particular words that the police or the prosecutor are required to use in advising a defendant, in sum or substance, the defendant must be advised, first, that he has the right to remain silent. Second, that anything he says may be used against him in a court of law. Third, that he has the right to consult with a lawyer before answering any questions and the right to the presence of a lawyer during any questioning. And, finally, that if he cannot afford a lawyer, one will be provided for him prior to any questions he so desires.

A person may validly waive his rights regardless of whether or not he had a full understanding of the criminal law or procedures or, in particular, what he says on waiving his rights may be used later in the criminal process. What must be shown for a valid waiver is that the individual grasp the plain meaning of the words and that he did not have to speak to the interrogator, that any statement might be used to his disadvantage, and an attorney's assistance would be provided upon request at any time before questioning would be continued.

Before you may consider as evidence a statement made by the defendant in response to questioning while he was in custody, you must find beyond a reasonable doubt that the defendant was advised of his rights, understood those rights, and voluntarily waived those rights and agreed to speak to the police or an Assistant District Attorney. If you do not make those findings, then you must disregard the statement and not consider it.

So to conclude, that means that if the People have not proved beyond a reasonable doubt that a statement of the defendant was voluntarily made to law enforcement, then you must disregard that statement and not consider it.

If the People have proved beyond a reasonable doubt that the statement -- that a statement of the defendant was voluntarily made to law enforcement, then you may consider that statement as evidence and evaluate it as you would any other evidence.

(Ex. 22U at 10151:4-10158:12.)

concurring in part) ("Whatever might be a judge's view of the voluntariness of a confession, the jury in passing on a defendant's guilt or innocence is, in my judgment, entitled to hear and determine voluntariness of a confession along with other factual issues on which its verdict must rest."). Which leads us to the conundrum that faced the trial court when it received three jury notes in quick succession.

The day after the Court delivered its charge (during the first full day of deliberations), the jury sent out a series of three notes. The first note asked the judge to reread his instructions on confession, as well as a reread of portions of the testimony of Ramon Rodriguez and Neftali Gonzalez, regarding "Pedro's confession."[3] In the second note, which was written five minutes after the first note, the jury asked for: "Clarity on corroboration consequence. . . . Clarity on may not convict defendant on his own words, solely? . . . Inference can only be drawn from proven facts?" The second note also asked for "the laptop with the video pleas."

While the court was formulating its response to the jurors first two notes, the jury sent out a third note, which the court read to the parties:

> We, the jury, request that the judge explain to us whether if, we find that the confession at CCPO before the Miranda rights was not voluntary, you must disregard the two videotape confessions at CCPO and the DA's office. The confessions to Rosemary and Becky Hernandez and the confessions to the various doctors.

Ex. 22U at 10202 (Emphasis (underlining of the word "if") in original note from jury.).

The parties immediately weighed in as to what the jury should be told: The People suggested that the answer to the jurors' note was "No;" defense counsel countered that the answer was "yes." The defense answer was obviously wrong, and the Court quickly ruled:

---

[3] Rodriguez and Gonzalez were two of the various non-law enforcement persons to whom Hernandez made statements about the killing or a killing. As the trial judge correctly recognized, there were no admissibility issues with their testimony about what Hernandez had said to them, and the jurors were simply to evaluate their testimony as they would the testimony of any witness on any issue.

"Agree, the answer is no. That's the short answer."

The trial judge was technically correct— No is "the short answer," because the jury was not *required* to disregard the subsequent confessions (whether to law enforcement after *Miranda* or to various non-law enforcement witnesses) if it found the pre-*Miranda* confession to have been involuntary. But the technically correct answer was an incomplete answer to the question, because the jurors were not told that they were free to disregard those confessions, or on what basis they could make that choice (and obviously, the basis would differ if the confessions were made to law enforcement or lay witnesses).

At that point, defense counsel asked to make a record and engaged in the following discussion with the court:

> MS. FONTIER: Your Honor, obviously, it's impossible to go back in time. But what occurred in this situation is that Mr. Hernandez was taken into custody. He was interrogated for hours, and he made a statement as a product of that. Everything that flows after that is based on that initial confession. He is in continuous custody throughout time that he talks to ADA Durastanti. The police had just gotten this involuntary confession from him and then finally agreed to let his family speak to him. They had denied request by his family and by Mr. Hernandez to speak to his family prior to obtaining this involuntary confession. So, it's a product of exactly what happened there. And, then, obviously as the case proceeds and your Honor chose not to suppress the statements, there are doctors involved and other issues. I mean we were proceeding because the statements were taken from him, but they were taken in an involuntary fashion. Everything is a product of the initial confession. So, without that, it's-- I mean, there is-- it would be impossible to mount a defense. Now, if, in a confession case, if everything that comes afterwards is going to be admissible even if the initial confession itself were not, I mean you are tying the hands of the defense. It's an impossible situation to put somebody in We either have to say, you know, we are going to rest, and we are going to ride on the hope that the judge suppresses this confession and move forward, or we are going to prepare an actual defense. But everything comes from the initial confession. If the initial confession is flawed, everything else falls.
>
> THE COURT: All right. So, you put your finger on the problem. There was a *Huntley* Hearing and denied suppression. And if the jury wants to disregard all statements, they can. That's entirely up to them, but their

15

question is very carefully worded but is – must they, and the answer is no. The law does not require them to do that. There is -- there is no fruit of the poisonous tree law for the jury. It's entirely up to them.

MS. FONTIER: At the very least, I ask that you instruct them that it's up to them. They don't have to disregard them but if they choose to.

THE COURT: I am going to say no. I think their question is very carefully worded, and I am going to say no because that's it.

MS. FONTIER: But, Judge, simply saying no to that question says they are there. Use them. Pay attention to them. It's not telling them that they can disregard them if they want to, which is actually apparent. Your Honor is deciding the ruling, which, again, I think is improper. Everything is a product of the initial confession.

THE COURT: Right. That's your argument. So, I think I am best saying less than more. I mean I can remind them to follow my legal instructions.

MS. ILLUZZI: Judge, there is a really specific question.

THE COURT: I would rather just leave it at that. Give them the short answer, and they are all free to send out more notes if they want to.

MS. FONTIER: But it's misleading, Judge.

THE COURT: I don't think it is. So, you have got your objections. So, let's talk about the transcript. Is there, like, a basic disagreement?

MR. FISHBEIN: Excuse me, Judge. Can I just add one line.

THE COURT: Sure.

MR. FISHBEIN: They are entitled to, in effect, overrule your decision.

THE COURT: Certainly. They certainly are.

MR. FISHBEIN: On the voluntariness?

THE COURT: Yes.

MR. FISHBEIN: Even with -- withdrawn. If you had found that the first statement was not admissible?

THE COURT: Right.

16

MR. FISHBEIN: Then there would be no question that the videotaped second confession at CCPO -- the one from 2:50 until 3:20 would also clearly flow from it and be suppressed. It's within moments in minutes.

THE COURT: In the context of a *Huntley* Hearing, you might be right. You might not. I don't know. But we are not there.

MR. FISHBEIN: But what you are saying to them because that's what the law says. You have a right to overrule me without telling them what your ruling was. But then you are not allowing them to do exactly what I would argue many courts would do on a statement that comes within ten minutes of the initial involuntary statement. They are saying no. So, you are saying to them, you are saying to them, you must consider it.

MS. ILLUZZI: No.

MR. VINOCUR: That's what is misleading.

THE COURT: I'm not. And I don't want to get into where the fruit of the poisonous tree doctrine meets the jury instructions on voluntary confessions. That's I don't want to go there. I will just answer their questions. I don't think I am misleading them or limiting your defense at all by just saying no. It's not a legal requirement.

(Ex. 22U at 10202-10206). Although defense counsel never cited to *Seibert*, the defense argument

was unmistakably predicated on that Supreme Court precedent.

The trial court then brought the jury into the courtroom and proceeded to answer the

questions presented by the three notes, in the order in which the jury asked them.

> So, I am going to start with the instructions on confessions. So, I will begin by reminding you that you heard testimony that the defendant made statements to various people, both members of law enforcement and civilians. As to statements made by the defendant to civilians, that is people not engaged in law enforcement activity, you will evaluate that testimony like any other testimony. You must decide whether the statements were, in fact, made by the defendant, and you must decide whether all or a portion of the statements were truthful and accurate. In making these decisions, you will use the same tests of credibility and reliability that I have discussed in the earlier part of my charge.

Ex. 22U at 10210-10211. The Court then reread its initial jury instructions "on the law as it relates

to testimony concerning statements that the defendant made to police officers and an Assistant

17

District Attorney." (*Id.*; *see*, *supra.*, at n. 1). After the judge finished reading those instructions, the court reporter began reading the testimony of Ramon Rodriguez and Neftali Gonzalez to the jury. The reporter finished reading Rodriguez's testimony and got half-way through Gonzalez's testimony before the judge decided it was too late in the evening to continue and adjourned the proceedings to the next morning.

When the trial continued the next morning, defense counsel asked to be further heard on the "third note":

> MS. FONTIER . . . . One of the key cases is *Chapelle*, and in that case the question is, is the second questioning attenuated enough so that the person is effectively being questioned for a second and new time. And a lot of the factors which are set out in the motion, that go into that, are the timing, whether there was a significant break, whether there was a change in personnel. . . . This jury needs some guidance. "No" is the exact opposite of that. It tells them it is perfectly fine, ignore it,' don't worry about that issue, move on from custody. That is what you are saying when you are saying "no."

> THE COURT: That is exactly what I don't want to say, so I think the best answer to give to this particular note is a "no". They wrote the note very carefully. It is framed in terms of, if we find the first statement to be non-voluntary, must we disregard all the rest. The very simple answer is "no", I believe. Believe me, I don't see any other way of answering this that doesn't involve then instructing them on attenuation, and "cat out of the bag", and basically replaying the *Huntley* hearing, which is not their function here, I don't think.

Ex. 22U at 10221-10225.

The argument concluded, the court brought the jury into the courtroom and finished reading Gonzalez's testimony. The court then reread the instruction it gave the jurors in its original charge regarding "corroboration of statements." With that complete, the court finally addressed the jurors' third note:

> . . . I am going to reread your question for you, and then I'll answer the question. In this note you said, "we, the jury, request that the Judge explain to us whether if we find that the confession at CCPO before the Miranda

> rights was not voluntary, we must disregard the two later videotaped
> confessions at CCPO and the DA's office, the confessions to Rosemary and
> Becky Hernandez, and the confessions to the various documents. " And the
> answer is, no. Thank you very much. So, I will ask you to continue your
> deliberations.

*Id.* at 10231.

Judge Lehrburger concluded that the trial judge's response to the question violated

*Missouri v. Seibert*, *supra*.: "The jury asked the Trial Judge to "explain" whether they

"must" disregard the post-Miranda confessions if they found that the pre-Miranda

confession was not voluntary. The Trial Judge answered "no," yet did not provide any

guidance to the jury on how they were to consider the relationship between the pre- and

post-Miranda confessions. Judge Lehrburger determined that this less-than-complete

response violated Hernandez's due process rights. He further concluded that the Appellate

Division had acted unreasonably when it concluded otherwise, because the response to the

note "did not provide any guidance to the jury on how they were to consider the relationship

between the pre-and post-Miranda confessions." R&R at 83.

Respondent argues that the learned Magistrate Judge's finding in this regard was

erroneous because, "Neither Judge Lehrburger nor Hernandez has identified a Supreme

Court decision extending *Seibert* beyond the context of a suppression claim."

(Respondent's Objections at 6).

*Seibert* was indeed concerned with the admissibility – determined by a court at a

pretrial suppression hearing – of repeated statements following *Miranda* warnings as part

of a two-step interrogation procedure. *See Seibert*, 542 U.S. at 604-05.  Nothing in *Seibert*

discusses how trial courts should respond to jury notes of any sort, let alone one like that

the trial court received in petitioner's trial. And to the extent petitioner is arguing that the

19

state courts unreasonably failed to extend *Seibert* in response to the jury note, it is also true that the Supreme Court "has rejected the unreasonable-refusal-to-extend rule." *See White v. Woodall*, 572 U.S. 415, 426 (2014) ("To the extent the unreasonable-refusal-to-extend rule differs from the one embraced in *Williams* and reiterated many times since, we reject it.").

But the People's objection misses the mark.

In *Seibert*, the Supreme Court laid out the process for determining the admissibility of a "*Mirandized*" confession that was preceded by an "un-*Mirandized*" confession. That process is relevant, not only to a court that is making a pre-trial determination of the admissibility of such a statement, but also to jurors who are deciding whether to consider such statements or to set them aside as involuntary during deliberations. As the trial judge correctly recognized, the jury was free to find that subsequent confessions were involuntary– they were, in essence, free to "overrule" the findings of fact that undergirded the trial judge's decision at the *Huntley* hearing, and to conclude that the series of confessions were a single continuous chain of events. Whether the post-Miranda confessions to law enforcement were voluntary or involuntary was, as Judge Lehrburger recognized, *the central issue* in the case; the argument that those confessions were involuntary, as part of a single continuous chain of events, was the centerpiece of the defense. That being so, constitutional due process required the trial court to deliver a response that was more than "technically" correct; it required a "meaningful" answer that was responsive to the jury's request for an "explanation" about what to do if it made a certain finding. Judge Lehrburger found that the trial court's terse one-word answer "deprive[d] [] [Hernandez] of a constitutional right" and was "so deficient as to constitute

20

a federal due process violation." (R&R at 83).

I conclude that Judge Lehrburger was correct to make this finding, and I overrule Respondent's objection.

Trial courts are understandably loath to confuse jurors with nuances of suppression law that they believe to be outside the jurors' province as the triers of fact. In *People v. Medina,* 146 A.D.2d 344 (1989), the defendant argued that his statement to police should not have been admitted into evidence because his right to counsel had attached before the statement was made. He urged that the right to counsel issue should have been submitted to the jury. The Appellate Division First Department demurred, because the issue was a purely legal one. "To decide this issue ... would require a knowledge of the criminal justice system which not only lay people, but even lawyers who are active in such practice do not possess" (*id.* at 350, 541 N.Y.S.2d 355). The Court mused:

> "If a literal interpretation of the words 'involuntarily made' as used in CPL 60.45 were to require the issue of right of counsel to be submitted to a jury because it is a right derived from the Constitution, then it will be equally argued that the same rule must apply to statements obtained in violation of other constitutional challenges. For example, if a statement was obtained where there was allegedly no probable cause *(Dunaway v New York*, 442 US 200 [1979]) do we submit the issue of probable cause to the jury? Where a person is arrested in his home without a warrant do we submit that issue and the issue of exigency to the jury? *(Payton v New York*, 445 US 573 [1980].) *If a statement is first obtained in violation of Miranda, and a subsequent statement is made after proper warnings have been given do we submit to the jury the issue of attenuation (People v Tanner, 30 NY2d 102 [1972]) or the issue of whether the statements '[were] in reality a single continuous chain of events'? (People v Chapple, 38 NY2d 112, 114 [1975].)* ...

*People v. Medina*, 146 A.D.2d 344 (1989) (Emphasis added). Reading this dictum, one might well think that the judge was correct not to instruct the jury beyond its terse "No."

But in *People v. Woods*, 290 A.D.2d 346 (2002) the First Department made it clear that the concerns it voiced in *Medina* did not relieve a trial court from responding

21

meaningfully to a jury's inquiry about whether a defendant's statement was obtained lawfully. In *Woods*, the deliberating jury sent out two notes relating to confessions. The first asked whether, "prior to being arrested, can a person be asked to answer any questions before being read his Miranda rights?" and the second asked, "Was [defendant] supposed to be Mirandized prior to his initial verbal statement?" To both questions, the court responded by informing the jury that it could not answer the question. *Woods*, 290 A.D.2d at 347. The Court reversed the defendant's conviction holding that "the court's responses 'I can't answer that question' and 'I cannot give you an answer to that question,' to the jury's appeals for clarification and guidance, do not satisfy the requirement of a meaningful response." *Id.* The First Department specifically rejected the People's reliance on *Medina*, stating: "Notwithstanding the People's position that the jury's questions required a legal ruling beyond its responsibility, *the fact issue of whether a defendant's statement is voluntary may properly require a determination by the jury of whether the police procedure violated the defendant's constitutional rights by questioning him while he was in custody without first informing him of his Miranda rights." Id.* at 348. (Emphasis added)

While the trial court's wariness to go off script to provide the jurors with additional legal instruction on the admissibility of petitioner's confessions is understandable ("I don't want to get into where the fruit of the poisonous tree doctrine meets the jury instructions on voluntary confessions. That's I don't want to go there. . . . It's not a legal requirement" . . . "I don't see any other way of answering this that doesn't involve then instructing them on attenuation, and 'cat out of the bag,' and basically replaying the *Huntley* hearing, which is not their function here"), such concerns must give way to the

22

more pressing concern: to protect petitioner's constitutional rights— and that means properly (fully) instructing the jury on the law. In point-of-fact, it *is* the jury's job "to replay the Huntley hearing" if they find a defendant's un-Mirandized statement to have been involuntary. Not, of course, in the *Huntley* sense – only a court can determine admissibility – but a jury is free to disagree with a judge in so far as he made a finding of voluntariness. And in order to make that independent assessment of voluntariness, the jury needs to understand what the rules are. A proper answer to the question asked by this jury would have been, "No, but…."; "No, you are not required to disregard those subsequent statements, but you may do so if you find that they too were involuntary." And because the defense argument was that all the confessions were part of a continuous course of conduct, the jury needed to be told about attenuation if the response was to be meaningful. *Seibert* requires no less.

The People make a series of additional arguments that do not withstand scrutiny.

*First*, the People contend that the response was "not erroneous under state law." (People's Objections at 10). As an initial matter, state law is substantively identical to *Seibert* on the issue of attenuation where, as here, "an improper, unwarned statement gives rise to a subsequent Mirandized statement as part of a 'single continuous chain of events.'" *People v. Paulman*, 5 N.Y.3d 122, 130 (2005) (internal citation omitted). Nor, for substantially the same reasons set forth in Judge Lehrburger's R&R, is it material to the analysis whether state law compelled the trial court to include an instruction on attenuation in its initial charge. Hernandez does not argue that *Seibert* compelled the trial court to instruct the jury on attenuation in its initial charge. (R&R at 84 ("[T]he Court is not confronted here with the question of whether an instruction on voluntariness or attenuation should have been given in the first place."). He argues that the trial

23

court failed to "respond meaningfully to the inquiry" that the jury sent out. *People v. Almodovar*, 62 N.Y.2d 126, 131 (1984))). And as Judge Lehrburger correctly found, the trial court's terse answer of "No" to the jury's question was "neither meaningful nor responsive to the jury's request for the court to 'explain' what it must do" because it failed to give the jury *any* meaningful guidance on how to evaluate a central issue in the case. (*See* R&R at 86).

*Second*, the People argue that Hernandez "was not prejudiced by the absence of an attenuation instruction . . . because the court's [original] charge left the jury well-equipped to assess the arguments petitioner actually made in summation—namely, that petitioner was a 'limited, vulnerable man' whose will was overborne by 'undue pressure' from interviewers and that his initial confession was the product of custodial interrogation before the administration of *Miranda* warnings." (*See* Government's Objections at 12). But as Judge Lehrburger correctly found, the jury was "actively grappling with how to deal with the confessions." The jury sent out three notes on the issue of the voluntariness of the confessions. (*See* R&R at 91 (citing Dkt. No. 1-59 at 10209:20-10210:9)). And the original charge did not explain attenuation at all. So, when "the jury requested an *explanation* about whether finding Hernandez's initial confession to be involuntary would require them to disregard his subsequent confessions," "it was incumbent on the Trial Judge to provide" an accurate "supplemental instruction." (*See* R&R at 85).

*Third*, Judge Lehrburger correctly concluded that the jury note response satisfied the *Cupp* standard, which asks "whether the ailing instruction [in question] by itself so infected the entire trial that the resulting conviction violates due process," rather than "merely whether the instruction is undesirable, erroneous, or even 'universally condemned.'" *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973); *see also* R&R at 83. This case "hinged entirely on Hernandez's confessions," and the People heavily and repeatedly relied on them to convict Hernandez. (R&R at 90; *see also id.* at 90-

24

91 (noting that nothing aside from the confessions "directly link[ed] him to Patz's disappearance.")). Moreover, the jury was obviously focused on the voluntariness of Hernandez's confessions, as evidenced by its multiple notes to the trial judge on this topic, including the jury note here in question. (*See* R&R at 91).

But rather than give the jury "direction [on] how to apply the analysis required by *Seibert*" to the confessions – the issue posed by the jury note – the trial court declined to give the jury any meaningful guidance and, as a result, "den[ied] [the] defendant the opportunity" to have the jury meaningful consider this "'highly credible defense.'" (R&R at 86-87 (quoting *Jackson*, 404 F.3d at 625)). This error was not merely "undesirable, erroneous, or even universally condemned." *Cupp*, 414 U.S. at 146. It went to the heart of the defense. (*See* R&R at 86- 88; *Jackson*, 404 F.3d at 624-27 (affirming grant of habeas because denial of justification jury instruction violated defendant's due process).

*Fourth*, Respondent fails to persuade that the case law relied on by Judge Lehrburger compels a result different than the one he reached.  In *Jackson*, the Second Circuit concluded that the trial court's refusal to give a justification instruction violated the petitioner's due process because "the evidence could have allowed a jury to conclude that Jackson acted justifiably and thus to acquit him of all homicide charges." *Jackson*, 404 F.3d at 624-25. Similarly, in *Rodriguez*, the Second Circuit found a due process violation where the state court failed to give a justification instruction. *Rodriguez*, 648 F. App'x at 139-40. There, mirroring the jury's mixed verdict in this case, the Second Circuit reasoned that the jury's acquittal of petitioner of second-degree murder and first-degree manslaughter ("counts for which the jury was charged on justification") "signal[ed] not only the State's failure to disprove justification beyond a reasonable doubt, but also the jury's openness to crediting Rodriguez's version of events." *Id.* (jury notes showed that jury

"clearly understood that it could not consider justification with respect to second-degree manslaughter," similar to the jury notes in Hernandez's showing it grappled with *Seibert*-related issues).

Respondent attempts to distinguish these cases on the grounds that, "The court's response did not preclude the jury from disregarding all of petitioner's subsequent statements if they found his initial statement at the CCPO involuntary; it simply conveyed that they were not required to do so" and "unlike *Rodriguez* and *Jackson*, the court's response did not create a situation where the jury was unable to acquit petitioner . . . ." (Respondent's Objections at 10- 11). But these arguments both ignore the plain language of what the jury wanted— an *explanation* of how to treat the subsequent confessions if it concluded the original pre-Mirandized confession was involuntary. The instruction that was given had the practical effect of "preclud[ing]" the jury from disregarding all of petitioner's subsequent statements if they found the initial statement at the CCPO involuntary" because it failed to inform the jury of its ability to find that the statements were involuntary, or provide the jury with any guidance at all about how to make that assessment.

*Finally*, Respondent's attempts to distinguish *Arroyo v. Jones*, 685 F.2d 35 (2d Cir. 1982) fail for substantially similar reasons. (People's Objections at 12-13). Specifically, just as the court in *Arroyo* "did not give the jury an[y] assistance in how to apply a presumption [as to intent—], whether they were free to disregard it, whether it was merely something they might infer, or whether the defendant had to overcome it" (*Arroyo*, 685 F.2d at 40), the trial court here likewise "left the jury with no direction how to apply the analysis required by *Seibert*." (R&R at 86.) The jurors were not told that they could disregard the subsequent confessions; neither were they informed of how to decide whether subsequent confessions should be disregarded because they were not sufficiently attenuated.

26

There can be no serious question that the erroneous instruction here had a "special impact" on the jury given the prominence of the confessions to the case. That the jury continued to deliberate for almost a week after the trial court's response, strongly suggest that the jurors continued to struggle mightily—in the absence of meaningful guidance—with how to consider Hernandez's confessions.

Therefore, Respondent's objection to Judge Lehrburger's conclusion that Hernandez was deprived of due process by the trial judge's response to the jury's note is overruled.

However – and strange though it may seem – Petitioner's objection to the learned Magistrate Judge's conclusion that this constituted only harmless error fares no better. Even though the state court acted unreasonably in concluding that there was no error of constitutional magnitude in the trial court's response to the jury's request for clarification, Petitioner has not demonstrated that the state court's alternative holding – that any error in this regard was harmless – was either contrary to law or an unreasonable application of law to the facts. That counterintuitive result is compelled by the prevailing standard for evaluating harmless error findings on habeas. (*See* R&R at 88-95.)

A state-court merits determination of harmless error is reviewed "under a two-part standard." *Krivoi v. Chappius*, No. 21-2934-PR, 2022 WL 17481816, at *3 (2d Cir. Dec. 7, 2022).

A petitioner must convince the habeas judge that (1) there is grave doubt about the petitioner's verdict, as required under *Brecht Abrahamson*, 507 U.S. 619 (1993)), and (2) that every fair minded jurist would agree that the error was prejudicial, as required by AEDPA. *See Brown v. Davenport* 142 S. Ct. 1510, 1525 (2022). "A judge is in 'grave doubt' when 'the matter is so evenly balanced that the judge feels himself in virtual equipoise as to the harmlessness of the error.'" *Peck v. United States*, 106 F.3d 450, 454 (2d Cir. 1997) (quoting *O'Neal*, 513 U.S. at 435).

Judge Lehrburger concluded that Petitioner satisfied neither standard. He harbored "reasonable doubt," but not "grave doubt," about the guilty verdict reached by the jury on some counts. R&R at 92. Frankly, I find the discussion of "reasonable doubt" versus "grave doubt" confusing, especially as "reasonable doubt" is the standard applicable to a criminal conviction. But I need not explore this aspect of Judge Lehrburger's decision because he is correct that not every fair-minded jurist would agree that the error here was prejudicial.

As noted above, the Appellate Division concluded that the long period between the un-Mirandized questioning and ADA Dursanti's questioning – a total of eleven hours, including several hours during which Hernandez intermittently ate and slept – meant that his confession to Dursanti was sufficiently attenuated from the earlier questioning so as to render it voluntary. *See* R&R at 93-95. For this reason, the trial judge's error in failing to give the jurors a meaningful answer to the third note insofar as it addressed statements made to law enforcement personnel was deemed harmless.[4] I cannot say that no reasonable jurist confronted would have failed to reach the

---

[4]     The jury's third note also referred to the confessions given to various lay witnesses to whom Hernandez confessed: "Rosemary and Becky Hernandez and the confessions to the various doctors." The trial judge correctly instructed the jury in its initial charge (Document 1-59 at 326-27), and then re-instructed the jury after receiving the notes, that:

> [S]tatements made by the defendant to civilians, that is people not engaged in law enforcement activity, you will evaluate that testimony like you will any other testimony. You must decide whether the statements were, in fact, made by the defendant and you must decide whether all or a portion of those statements were truthful and accurate. In making these decisions you will use the same tests of credibility and reliability that I discussed just a few minutes ago.

Document 1-59 at 386-877.

Of course, the trial courts instruction would control the jury's consideration of the "confessions" Hernandez made to Rosemary and Becky and other folks prior to his confessions to law enforcement, regardless of what the jury decided as to the lawfulness of Hernandez's subsequent confessions to law enforcement. And those early on statements certainly bolstered the People's case and, perhaps even, would have been sufficient enough alone to gain a conviction.

However, if a properly instructed jury were to determine that Hernandez statements to law enforcement (including his statement to the ADA) were indeed obtain in violation of his constitutional rights, it would seemingly follow that the jury would be required to make yet another determination: whether Hernandez's subsequent post-arrest statements to the doctors and other non-law enforcement persons should be excluded from their consideration,

same conclusion as the Appellate Division on this point. Therefore, I, like Judge Lehrburger, cannot say that the failure to give the jurors a proper response to their note, while of constitutional magnitude, was anything other than harmless error.

Conclusion

For the reasons given in this Decision and Order, Petitioner's and Respondent's objections to the Report are denied following a *de novo* review.

Careful review of Magistrate Judge Lehrburger's Report reveals that there is no facial error in its conclusions. The Court adopts Judge Lehrburger's Report and his recommendations contained therein, as the decision of the Court.

The petition for a writ of habeas corpus is denied and the petition is dismissed.

Section 2253(c) permits the issuance of a Certificate of Appealability only where a petitioner has made a "substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell*, 537 U.S. 322, 336–37 (2003). Under the controlling standard, a petitioner must "show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), (quoting *Barefoot v. Estelle*, 463 U.S. 800, 893, n. 4 (1983). The Court finds that a certificate of

---

under the "fruit of a poisonous tree" doctrine— yet another concept the trial court would have had to explain to the jurors. One can see why the *Medina* Court was reluctant to go down this rabbit hole.

Judge Lehrburger did not address the issue because "the parties [did] not addressed the extent to which *Seibert* would have any application to those confessions [confessions made to civilians] as they were not made directly to law enforcement personnel, although law enforcement personnel were present for at least some of those statements."

Regardless, the Court need not grapple with this tentacle of the *Seibert* error since the Court adopts the magistrate judge's principle finding that any *Seibert* error was harmless on the ground that the no reasonable jurist confronted with evidence of the attenuation between Hernandez un-Mirandized statement and the statement he later made to ADA Durasanti, would have failed to reach the same conclusion as the Appellate Division.

appealability should issue as to the issue of the "*Seibert/*inadequate response to the jury note question." Accordingly, the Court authorizes a Certificate of Appealability as to that limited issue and declines to issue a certificate as to any other ground presented in the petition.

This constitutes the decision and order of the Court.

Dated:  New York, New York
       June 11, 2024

Colleen McMahon
United States District Judge